UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Bankr. Case No. 17-11721-MKV |
| RAFAEL LOZADA, | Adv. Pro. No. 17-01116-MKV |
| Debtor. | |

| | |
|---|---|
| RAFAEL LOZADA, | Civil No. 18-cv-11643-AKH |
| Appellant, | On Appeal from Order of the United States Bankruptcy Court for the Southern District of New York dated November 27, 2018 |
| v. | |
| EDUCATIONAL CREDIT MANAGEMENT CORPORATION, | |
| Appellee. | |

## APPELLEE EDUCATIONAL CREDIT MANAGEMENT CORPORATION'S BRIEF

Law Offices of Kenneth L. Baum LLC
Kenneth L. Baum (KB-2492)
167 Main Street
Hackensack, New Jersey 07601
(201) 853-3030
(201) 584-0297 (Facsimile)

*Attorneys for Appellee*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................iii-ix

CORPORATE DISCLOSURE STATEMENT .................................................1

I.   STANDARD OF APPELLATE REVIEW.................................2

II.  STATEMENT OF THE ISSUES .........................................2

III. STATEMENT OF THE CASE   ..........................................3

     A.  Nature of the Case ..............................................3

     B.  Statement of the Facts ........................................4

IV.  SUMMARY OF THE ARGUMENT .....................................12

V.   ARGUMENT ...........................................................15

     A.  Legislative History Concerning Student Loans ..............15

     B.  The Undue Hardship Standard ................................17

     C.  Appellant did not and cannot meet his burden under
         any one of the *Brunner* prongs, let alone all three  .........20

         1.  The Bankruptcy Court did not err in concluding
             that Appellant failed to satisfy his second
             prong burden...............................................21

         2.  The Bankruptcy Court did not err in concluding
             that Appellant failed to show good faith efforts
             to repay his ECMC Loan ................................25

     D.  History of Religious and Charitable Donations
         in Bankruptcy Cases ..........................................29

     E.  The Religious Donation Protection Act does not apply
         to Student Loan Dischargeability Proceedings .................32

     F.  The Bankruptcy Court employed the proper income
         and expense analysis under the first *Brunner* prong .........44

     G.  The Religious Freedom Restoration Act also

i

does not apply ....................................................................47

H.   Section 523(a)(8) as applied by the Bankruptcy Court
did not offend the First Amendment ................................50

I.   Appellant is not entitled to a partial discharge ...................53

VI.   CONCLUSION   .........................................................................54

Statement of Oral Argument   .........................................................................56

Certificate of Compliance   .........................................................................57

# TABLE OF AUTHORITIES

**Cases**

**United States Supreme Court**

*Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450, 122 S.Ct. 941,
151 L.Ed.2d 908 (2002)................................................................................33

*Bates v. United States*, 522 U.S. 23, 29030, 118 S.Ct. 285,
139 L.Ed.2d 215 (1997)...........................................................................33, 34

*Christopher v. Harbury*, 536 U.S. 403, 417, 122 S.Ct. 2179,
153 L.Ed.2d 413 (2002)................................................................................20

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520, 532, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) ................50, 51

*City of Boerne v. Flores*, 521 U.S. 507, 535, 117 S.Ct. 2157,
138 L.Ed.2d 624 (1997)................................................................................48

*Cohen v. De La Cruz*, 523 U.S. 213, 222, 118 S. Ct. 1212,
140 L.Ed.2d 341 (1998)................................................................................16

*Emp't Div. Dep't of Human Res. of Ore. v. Smith*,
494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) ..................49, 50, 53

*Grogan v. Garner*, 498 U.S. 279, 286-87, 111 S. Ct. 654,
112 L.Ed.2d 755 (1991)...........................................................................15, 16

*Law v. Siegel*, 571 U.S. 415, 134 S.Ct. 1188,
188 L.Ed.2d 146 (2014)...........................................................................46, 47

*United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241,
109 S.Ct. 1026, 103 L.Ed.2d 290 (1989).....................................................33

*United States v. Kras*, 409 U.S. 434, 446, 93 S.Ct. 631, 638,
34 L.Ed.2d 626 (1973) ............................................................... fn. 8

**United States Courts of Appeals**

*Alderete v. Educ. Credit Mgmt. Corp. (In re Alderete)*, 412 F.3d 1200
(10th Cir. 2005) ...................................................................28, 54

*Brightful v. Pa. Higher Educ. Assistance Agency (In re Brightful)*,
267 F.3d 324, 328 (3d Cir. 2001) ..................................................21

*Brunner v. N.Y. State Higher Educ. Servs. Corp.*, 831 F.2d 395
(2d Cir. 1987) ...............................................................18, 19, 20

*Christians v. Crystal Evangelical Free Church*,
141 F.3d 854 (8th Cir. 1997) ........................................................48

*Educ. Credit Mgmt. Corp. v. Frushour (In re Frushour)*,
433 F.3d 393 (4th Cir. 2005) ...................................... 18, 28, fn. 2

*Educ. Credit Mgmt. Corp. v. Polleys (In re Polleys)*,
356 F.3d 1302, 1309 (10th Cir. 2004) ..................................... fn. 2

*Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167
(2d Cir. 2006)............................................................................2

*Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*,
617 F.3d 402 (6th Cir.2010) .........................................................48

*Hemar Ins. Corp. of Am. v. Cox (In re Cox)*,
338 F.3d 1238 (11th Cir. 2003) .................................... 16, 54, fn. 2

*Lavoie v. Pacific Press & Shear Co., a Div. of Canron Corp.*,
975 F.2d 48 (2nd Cir. 1992) .........................................................52

*Listecki v. Official Comm. of Unsecured Creditors*,
780 F.3d 731 (7th Cir. 2015) ........................................................48

*Marschand v. Norfolk and Westerner Railway Co.*,

81 F.3d 714 (7th Cir. 1996) ........................................................51

*Morro v. City of Birmingham*, 117 F.3d 508
(11th Cir. 1997) ...........................................................................51

*Oyler v. Educ. Credit Mgmt. Corp. (In re Oyler)*,
397 F.3d 382, 386 (6th Cir. 2005) ....................................... 28, fn. 2

*Pa. Higher Educ. Assistance Agency v. Faish (In re Faish)*,
72 F.3d 298, 305 (3d Cir. 1995) ........................................... 21, fn. 2

*Spence v. Educ. Credit Mgmt. Corp. (In re Spence)*,
541 F.3d 538, 544 (4th Cir. 2008) ....................................... 24, fn. 3

*Sutton v. Providence St. Joseph Med. Ctr.*,
192 F.3d 826 (9th Cir. 1999) .............................................. 28, fn. 2

*Tetzlaff v. Educ. Credit Mgmt. Corp.*, 794 F.3d 756
(7th Cir. 2015) ....................................................................... fn. 3

*Traversa v. Educ. Credit Mgmt. Corp. (In re Traversa)*,
444 F. App'x 472 (2d Cir. 2011) ...............................................19

*United States Dep't of Educ. v. Gerhardt (In re Gerhardt)*,
348 F.3d 89 (5th Cir. 2003) ................................................ 28, fn. 2

*United Student Aid Funds v. Pena (In re Pena)*,
155 F.3d 1108 (9th Cir. 1998) ................................................. fn. 2

*Universal Church v. Geltzer*, 463 F.3d 218
(2nd Cir. 2006)...........................................................................33

*U.S. Dept. of Health & Human Serv's v. Smitley*,
347 F.3d 109 (4th Cir. 2003) ......................................................40

**United States District Courts**

*Brunner v. N.Y. State Higher Educ. Servs. Corp. (In re Brunner)*,
46 B.R. 752 (S.D.N.Y. 1985) ...............................................18, 37

*Educ. Credit Mgmt. Corp. v. DeGroot (In re DeGroot)*,
339 B.R. 201 (D. Or. 2006) ...................................................24

*Educ. Credit Mgmt Corp. v. Blake (In re Blake)*,
377 B.R. 502 (E.D. Texas 2007) ............................................25

*Educ. Credit Mgmt. Corp. v. Davis (In re Davis)*,
373 B.R. 241 (W.D.N.Y. 2007)...........................................22, 54

*Educ. Credit Mgmt. Corp. v. Waterhouse (In re Waterhouse)*,
333 B.R. 103 (W.D.N.C. 2005) ............................................24

*In re Cunningham*, No. 04-2636,
2006 WL 1133923, at *4 (N.D. W.Va. Apr. 26, 2006)..............................27

*In re McLaney*, 375 B.R. 666,
(M.D. Ala. 2007) ...........................................................35, 38, 39

*Williams v. New York Higher Educ. Servs. Corp.* (*In re Williams*),
296 B.R. 298, 302 (S.D.N.Y. 2003) ............................................2

## Bankruptcy Appellate Panels

*Educ. Credit Mgmt. Corp. v. Savage (In re Savage)*,
311 B.R. 835 (B.A.P. 1st Cir. 2004)............................................45

## United States Bankruptcy Courts

*Chapelle v. Educ. Credit Mgmt. Corp. (In re Chapelle)*,
328 B.R. 565 (2005) ........................................................24

*Dennison v. Hammond (In re Hammond)*,
236 B.R. 751, 767-68 (Bankr. D. Utah 1998) ................................47

*Fabrizio v. United States Dep't of Educ. (In re Fabrizio)*, 369 B.R. 238
(Bankr. W.D. Pa. 2007) ............................................................24

*Fulbright v. United States Dep't of Educ. (In re Fulbright)*,
319 B.R. 650 (Bankr. D. Mont. 2005) ........................................36

*In re Belcher*, 287 B.R. 839
(Bankr. N.D. Georgia 2001) ................................................50, 53

*In re Brunner*, 46 B.R. 752
(Bankr. S.D.N.Y. 1985)............................................................21

*In re Douglas*, 366 B.R. 241
(Bankr. M.D. Ga. 2007)............................................................39

*In re Duval*, No. 10-10450 JMP,
2012 WL 1123041 (Bankr. S.D.N.Y. Apr. 3, 2012) ....................19

*In re Gleason*, No. 15-31254,
2017 WL 4508844 (Bankr. N.D.N.Y. Oct. 6, 2017) ..............19, 20

*In re Lebovits*, 223 B.R. 265
(Bankr. D. Ariz. 1994)..............................................................21

*In re Lynn*, 168 B.R. 693
(Bankr. W.D. Pa. 2007) ......................................................50, 52

*In re McCafferty*, Adv. No. 15-80015,
2015 WL 6445185 (Bankr. E.D. Wash. 2015)......................14, 36

*In re McCormack*, Case No. 99-80401,
2000 WL 33710278, *fn. 7 (Bankr. D.S.C. 2000) ......................35

*In re McLeroy*, 250 B.R. 872,
(Bankr. N.D. Tex. 2000)......................................................35, 37

*In re Thoms*, 257 B.R. 144
(Bankr. S.D.N.Y. 2001)............................................................25

*Jean-Baptiste v. Educ. Credit Mgmt. Corp., et al. (In re Jean-Baptiste),*
2018 WL 1267944 (Bankr. E.D.N.Y February 23, 2018)............................21

*Pincus v. Graduate Loan Ctr. (In re Pincus),*
280 B.R. 303, 318 (Bankr. S.D.N.Y. 2002) ............................................40, 44

*Pobiner v. Educ. Credit Mgmt. Corp. (In re Pobiner),*
309 B.R. 405, 420-21 (Bankr. E.D.N.Y. 2004) ....................................26, 28

*Ritchie v. Northwest Educ. Loan Assn. (In re Ritchie),*
254 B.R. 913 (Bankr. D. Ida. 2000) ..........................................30, 32, 35, 38

## Statutes

11 U.S.C. § 105 ..........................................................................................53

11 U.S.C. § 523(a)(8) ...................................................................... *passim*

11 U.S.C. §523(a)(15)(A)...........................................................................47

11 U.S.C. §544(b) .......................................................................................30

11 U.S.C. §544(b)(2) ..................................................................................30

11 U.S.C. §548(a) .......................................................................................30

11 U.S.C. §548(a)(2) ..................................................................................30

11 U.S.C. §548(d)(2)(4) .............................................................................30

11 U.S.C. §707(b)...................................................... 30, 31, 44, 45, 46, 47

11 U.S.C. §707(b)(1) ............................................................................14, 31

11 U.S.C. §1325...........................................................................................45

11 U.S.C. §1325(b)(2)(A)......................................................................30, 47

20 U.S.C. §1001...........................................................................................16

42 U.S.C. §2000bb-1(a)............................................................49

Education Amendments of 1976
Pub. L. No. 94-482, §127(a), 90 Stat. 2141................................................16

Federal Debt Collection Procedures Act of 1990
Pub. L. No. 101-647, § 3621(2), 104 Stat. 4965 ...........................................17

Higher Education Amendments of 1998
Pub. L. No. 105-244, § 971, 112 Stat. 1837.................................................17

Religious Freedom Restoration Act of 1993
42 U.S.C. § 2000bb *et seq* .......................................................... *passim*

Religious Liberty and Charitable Donation Protection Act of 1998
PL 105-183, 112 Stat 517.......................................................... *passim*

## Congressional Record

144 CONG.REC. S4769-01 (May 13, 1998) ...................................... 34, fn. 6

144 CONG.REC. H3999-02 (June 3, 1998).................................................34

## Federal Rules

Fed. R. Bankr. P. 8012 ...........................................................1

Fed. R. Bankr. P. 8013 ...........................................................1

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Bankruptcy Procedure 8012, Defendant-Appellee Educational Credit Management Corporation discloses that it is a nongovernmental nonprofit corporation that is 100 percent owned by ECMC Group, Incorporated, a Delaware Corporation. ECMC further states that no publicly held company owns 10 percent or more of ECMC's stock.

## I.   STANDARD OF APPELLATE REVIEW

The district court reviews the bankruptcy court's findings of fact for clear error and reviews the bankruptcy court's legal conclusions *de novo*. *See* Fed R. Bankr. P. 8013; *Brunner v. New York State Higher Educ. Servs. Corp.* (*In re Brunner*), 46 B.R. 752, 756 (S.D.N.Y. 1985); *see also Williams v. New York Higher Educ. Servs. Corp.* (*In re Williams*), 296 B.R. 298, 302 (S.D.N.Y. 2003). A bankruptcy court's findings of fact will not be disturbed unless clearly erroneous. *See in re Traversa*, 444. App'x 472, 474 (2d Cir. 2011).

The constitutionality of a statute is a legal question subject to *de novo* review. *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 177 (2d Cir. 2006).

## II.   STATEMENT OF THE ISSUES

The issues before this Court challenge the bankruptcy court's factual findings and application of the student loan dischargeability standard to those facts. But the ultimate issue before this Court is whether the bankruptcy court correctly applied the three-part *Brunner* test, when it denied a discharge of Appellant Rafael Lozada's ("Appellant") student loan debt. Did the bankruptcy court err in concluding that Appellant, an educated, healthy, voluntarily-retired individual with a comfortable monthly surplus after providing for his basic needs, could not establish that

repayment of his student loan debt would be an undue hardship under 11 U.S.C. § 523(a)(8)?

### III.   <u>STATEMENT OF THE CASE</u>

#### A. Nature of the Case

Appellant filed for relief under Chapter 7 of the Bankruptcy Code on June 20, 2017, and in his schedules listed his student loans as a component of his debt accounting for 94.55% of his total unsecured debts. (*See* Appellant's Appendix (hereinafter referred to as "A.A.") 29-33). Appellant received a general discharge in that proceeding on September 19, 2017. Appellant then filed an adversary proceeding seeking a discharge of his federally-insured student loan claiming repayment would cause an undue hardship pursuant to 11 U.S.C. § 523(a)(8).

Trial was held on August 21, 2018. On November 16, 2018, the Bankruptcy Court issued a "Memorandum Decision and Order denying discharge of Appellant's federally-insured student loan. (A.A. at 324). The Bankruptcy Court concluded that Appellant failed to meet his burden requisite for each of the individually determinative *Brunner* prongs. (A.A. at 347). The Bankruptcy Court entered final judgment in favor of ECMC on November 27, 2018. (A.A. at 348).

This appeal followed. Appellant timely filed his Notice of Appeal seeking reversal of the Bankruptcy Court's decision denying him an undue hardship discharge, or alternatively, a partial discharge. (A.A. at 350).

### B. Statement of the Facts

The evidence at trial established that Appellant is a highly educated, healthy married individual in his late sixties with no dependents. Appellant was the only witness that offered testimony for the plaintiff's case in chief. He testified that when he was 38-years-old, he enrolled at Brooklyn Law School and incurred federal student loan debt for his educational expenses. (A.A. at 73, 103). Appellant completed his coursework at Brooklyn Law School and earned his Juris Doctorate. (A.A. at 73, 104-05). Appellant also incurred federal student loan debt to pay for the educational expenses of his son to earn his Bachelor's Degree at Saint John's University. (A.A. at 72, 109-10, 171). In March 2002, Appellant consolidated all of his outstanding student loans into one federally-insured consolidated student loan ("ECMC Loan"). (A.A. at 110-12). ECMC, a federal student loan guarantor in the Federal Family Education Loan Program ("FFELP"), is the holder of all right, title, and interest in the ECMC Loan. (A.A. at 72). At the time of trial, the outstanding balance of the ECMC Loan was approximately $338,000. (A.A. at 72).

Although Appellant earned his Juris Doctorate, he failed the New York bar exam on his first attempt and thereafter decided not to take another bar exam or pursue any type of career in the legal industry. (A.A. at 73, 104). Instead, he has held

4

various positions in the social service and non-profit sectors, and has worked within the government in support of non-profit initiatives, often at a supervisory or director level earning as much $75,000.00 per year. (A.A. at 73, 104-05). Appellant testified that he is able to drive, use a computer to perform tasks including conducting research on the internet, use e-mail, and create documents. (A.A. at 173-74). Appellant has been unemployed since 2014 and considers himself retired. (A.A. at 73, 172).

A vocational expert offered testimony for the defense about Appellant's employability and employment prospects. The expert testified that Appellant has the skills to be employed in a position with a non-profit organization, with the potential of earning an annual salary of anywhere from $40,000 to $90,000. (A.A. at 212). These positions would be sedentary in nature and within a 25-mile radius of Appellant's home in Samford, Connecticut. (A.A. at 213). The vocational expert also opined that if Appellant undertook a proper search for employment, he would likely be able to return to a position in the non-profit area within a few months. (A.A. at 216).

Nevertheless, Appellant testified that he has not considered seeking part-time employment even if it enabled him to be able to repay the ECMC Loan. (A.A. at 173). When Appellant was searching for employment, he confined his search solely to the non-profit industry. (A.A. at 186). Despite using federal student aid to finance

his law school education, Appellant never apparently considered pursuing any career in the legal industry, including a position as a paralegal or law clerk. (A.A. at 73, 104, 177). Instead, several years ago, after he stopped seeking other employment, Appellant and his wife unsuccessfully attempted to open a daycare center, despite having no experience in operating such a business. (A.A. at 128-29, 187). In the process, Appellant and his wife used $90,000 from Appellant's retirement fund toward that endeavor which failed before it even opened for business.  (*Id*.).

Appellant lives with his wife, a retired school teacher. He earns approximately $1,219.00 per month in Social Security income. (A.A. at 72). His wife earns approximately $4,685.00 in Social Security and pension income monthly. (A.A. at 256-74, 278). Appellant and his wife receive total net income of no less than $5,942 per month (the "Monthly Household Income"). (A.A. at 74). The evidence at trial showed that Appellant and his wife received the following tax returns: $4,609 for 2016; $5,037 for 2014; $3,852 for 2013; and $2,676 for 2012 (collectively, the "Tax Refunds"). (A.A. at 74). No portion of the Tax Refunds were used to repay the ECMC Loan. (*Id*.). Similarly, Appellant inherited approximately $30,000 from his mother in 2015 but did not use any of that money to repay the ECMC Loan.  (*Id*.).

Appellant and his wife claim estimated monthly household expenses totaling $4,509 (collectively, the "Monthly Household Expenses"): $2,500 for rent; $130 for electricity; $40-50 for gas heat; $13-15 for water; $100 for cellular phone; $100 for

internet and cable television; $500 for food and housekeeping supplies; $100 for clothing, laundry, and dry cleaning; $100 for personal care products and services; $100 for out-of-pocket medical expenses; $200 for transportation (i.e., gasoline and vehicle maintenance); $100 for entertainment and recreation; $200 for automobile insurance; and $314 for car payment. (A.A. at 135-37, 188-89). Subtracting the Monthly Household Expenses claimed by Appellant from the Monthly Household Income leaves Appellant and his wife with a monthly surplus of $1,433.

In addition to the Monthly Household Expenses, Appellant testified that his religion requires him (and his wife) to tithe ten percent (10%) of their income toward their church (the "Obligatory Religious Contribution").[1]

Q:    Charity. So, how much do you contribute to the church or to charitable organizations per month?

A:    We contribute ten percent of our income.

Q:    Okay. And is the something you've always done, you know, just based on the percentage of your income?

A:    For the last 40 years. Yes.

Q:    Okay. And why do you do that? Why do you contribute to charity or --

---

[1] For purposes of this appeal, ECMC is not taking a position as to the reasonableness of the 10% tithe related to a minimal standard of living. As the Court correctly found, in this case and under these circumstances, Appellant's tithing and charitable donations were excessive.

A:     Well, that's our belief. You know we're Christians and we believe that's what the Bible says. And so it will be that, that's what we do. We also give offerings sometimes that *go beyond* the ten percent.

(A.A. at 136)(emphasis added). In addition to the Obligatory Religious Contribution, he and his wife also give charitable offerings depending on what "we feel in our heart" ("Extra Donations"). (A.A. at 168-69).  During the five (5) years leading up to his chapter 7 bankruptcy, Appellant testified that he has never considered diverting even a portion dedicated to the Obligatory Religious Contribution or Extra Donations toward paying the ECMC Loan, and refuses to make any payment toward the ECMC Loan that would restrict his Obligatory Religious Contribution and Extra Donations. (A.A. at 171, 190). The following table summarizes Appellant's Obligatory Religious Contribution and Donations practices in relation to his household adjusted gross income over the five years leading to his 2017 bankruptcy filing.

| Taxable Year | Household Adjusted Gross Income | Obligatory Religious Contribution and Donations | % of Adjusted Gross Income |
|---|---|---|---|
| 2012 | $138,064 | $12,678 | 9% |
| 2013 | $138,325 | $24,783 | 18% |
| 2014 | $101,174 | $21,866 | 22% |
| 2015 | $94,406 | $21,544 | 23% |
| 2016 | $66,029 | $23,510 | 36% |

(A.A. at 256-74). While Appellant's income decreased, his Extra Donations substantially increased.

Appellant's bank statements from his joint checking account with his wife reflect numerous payments to his adult children on a regular basis, and he testified that he pays his granddaughter a weekly allowance of $25-30. (A.A. at 74). Bank statements also reveal that Appellant and his wife enjoy dining out regularly at various restaurants. (A.A. at 312-23). During the period from December 10, 2014 through April 21, 2017, Appellant and his wife spent a total of $10,468.82, or an average of approximately $361 per month, for dining out at numerous restaurants for their personal use and enjoyment. (*Id*.). The following table is representative of

Appellant and his wife's dining expenses in calendar year 2016 only, the year prior to his chapter 7 bankruptcy in 2017.

| | |
|---|---|
| January | $237.25 |
| February | $140.31 |
| March | $229.10 |
| April | $85.03 |
| May | $164.20 |
| June | $75.85 |
| July | $18.72 |
| August | $45.20 |
| September | $236.00 |
| October | $348.26 |
| November | $770.23 |
| December | $1,045.94 |
| 2016 Total: | $3,396.09 |

(*Id*.).

In addition to this discretionary spending, for a 12-month period from August 2016 to August 2017, while Appellant and his wife were paying rent on an apartment in New York, they were simultaneously renting an apartment in Florida at a monthly

cost of $1,100, or a total of $13,200 for the year.  (A.A. at 160-61). Additionally, Appellant regularly visits his father in Puerto Rico, and he and his wife spent over $1,500 on a family vacation to Virginia Beach. (A.A. at 174-75). During this time, the ECMC Loan remained outstanding but Appellant was not making regular payments to reduce the student loan debt.

Appellant obtained the ECMC Loan in 2002, but did not start making any payments toward it until 2007. (A.A. at 73, 180). Instead, he sought and was granted several deferments and forbearances from his obligation to pay his federal student loans (the "Deferments and Forbearances"). (A.A. at 74). Between April 2005 and May 2017, Appellant had Deferments and Forbearances totaling 80 months. (A.A. at 73). Between July 2013 and May 2017, the ECMC Loan was either in Deferment and Forbearance status for all but three (3) months. (*Id*.).

Evidence was produced at trial that Appellant is eligible to enter the William D. Ford Direct Loan Consolidation Program (the "Ford Program") in order to achieve greater flexibility in repaying his ECMC Loan. (A.A. at 75, 197). If he entered into the Ford Program, his monthly payment under the Income Contingent Repayment Program option ("ICRP") would be $826.15 for 300 months, based on his reported household adjusted gross income of $66,029 and a family size of 2, as reported in Appellant's 2016 federal income tax return. (*Id*.). Appellant was made

aware of his repayment options prior to trial, but he declined to enroll. (A.A. at 197-98).

## IV.    SUMMARY OF THE ARGUMENT

Appellant paid for his law school education using taxpayer-funded student loans. After failing the New York bar exam on his first – and only – attempt, Appellant gave up on any chance at a legal career. Then, before repaying the student loans he incurred for law school, Appellant requested additional taxpayer-funded student loans to voluntarily pay for his son's education at St. John's University from 1990-1994. Like Appellant, his son completed his course work and earned his degree. In 2002, Appellant eventually consolidated all his taxpayer-funded student loan debt into one loan in which ECMC is the holder of all right, title, and interest.

The crux of Appellant's argument on appeal stems from the Bankruptcy Court's treatment of his religious tithing and charitable giving under *Brunner's* first prong. Appellant argues that the Bankruptcy Court failed to afford him the protections of the Religious Liberty and Charitable Donation Protection Act of 1998 ("Religious Donation Protection") and the First Amendment Free Exercise Clause. He places most his efforts on criticizing the Bankruptcy Court's findings under *Brunner's* first prong, arguing that its erroneous findings about the reasonableness of his tithing tainted the remainder of its *Brunner* analysis under prongs two and three. In short, Appellant's silver-bullet for a complete discharge of his taxpayer-

funded student loan is cloaked in his religion. But viewing his financial narrative as a whole, Appellant's opposition to repaying the ECMC Loan is less about religion and more so about a lifestyle to which he has become accustomed.

Nevertheless, even if the Bankruptcy Court erred in finding that Appellant's tithing practices were excessive under these circumstances, its nondischargeability finding was still proper. Under the prevailing standard in the Second Circuit, Appellant was required to meet his burden under *all* three *Brunner* prongs – a burden, the Bankruptcy Court properly concluded, Appellant fell short of meeting. Applying the demanding burden of the second *Brunner* prong to the facts in this case, the Bankruptcy Court properly concluded that the simple fact that Appellant is in his sixties, without more, is not enough to satisfy the second prong. Appellant offered no evidence to support a finding that he is able to satisfy the rigorous requirement of the second *Brunner* prong. And his claims that he made substantial payments toward his student loan and remained in good standing are overshadowed by the facts that he often declined to make payments during times when he was more than able to; he did not use any of his $30,000 inheritance or any of his tax refunds to repay a portion of the student loan. Moreover, he increased his Extra Donations as his income decreased during the five years preceding his bankruptcy; and finally, he has made no efforts to curb other discretionary spending. Thus, even if Appellant could somehow identify erroneous findings under the first *Brunner* prong, it is not

13

enough for a reversal, because he still fails the other individually-determinative prongs.

Ultimately, Appellant claims that the Bankruptcy Court denied him a hardship discharge "because he and his family choose to tithe 10% of their income." (Appellant's Principal Brief ("App. Br."), page 2). "The bankruptcy court erred," Appellant contends, "because it examined the 'undue hardship' standard in 11 U.S.C. § 523(a)(8) in isolation without referencing 11 U.S.C. § 707(b)(1) and the Religious Donation Protection Act." (App. Br., p. 24) Appellant misconstrues the Bankruptcy Court's findings in this regard and strains to over-simplify its conclusion into a binary, all or nothing, approach.

In reality, the Bankruptcy Court, instead, duly considered the Religious Donation Protection Act, and properly concluded that "any interpretation [of the Religious Donation Protection Act] that expressly allows or disallows tithing should be rejected as both interpretations seem to amend [section] 523(a)(8) when Congress did not." (A.A. at 337)(quoting *In re McCafferty*, Adv. No. 15-80015, 2015 WL 6445185, *6 (Bankr. E.D. Wash. 2015). In doing so, the Bankruptcy Court applauded Appellant's dedication to charitable donations but concluded that his charitable donations, in excess of his purportedly Biblically-prescribed 10% and totaling over $100,000 in the five years preceding his bankruptcy was "excessive" given all of the facts and circumstances and considering the fact that Appellant is

attempting to discharge his federally-insured student loan. The Bankruptcy Court then properly treated Appellant's tithing as any other expense under a minimal standard of living: it determined whether it was necessary and/or reasonable.

As Appellant would have it, this appeal boils down to Appellant's Obligatory Religious Contribution, which the Bankruptcy Court did not disturb, and the Extra Donations over and above the Obligatory Religious Contribution – contributions that the Bankruptcy Court determined to be excessive under the circumstances of this case. The Bankruptcy Court was on solid ground when it concluded that Appellant failed to explain why amounts doubling his admitted Obligatory Religious Obligation of 10% were necessary to a minimal standard of living. Thus, the Bankruptcy Court's conclusion was not legal error. However, this Court need not even reach that issue because Appellant cannot meet his burden under *Brunner* prongs two and three.

## V.   ARGUMENT

### A.   Legislative History Concerning Student Loans.

Although a general purpose of the Bankruptcy Code is to provide a procedure where honest but insolvent debtors can obtain a "fresh start," the Bankruptcy Code also "limits the opportunity for a completely unencumbered beginning to the…debtor."   *Grogan v. Garner*, 498 U.S. 279, 286-87, 111 S. Ct. 654, 112 L.Ed.2d 755 (1991).  By excepting student loans from discharge, Congress made the

15

policy choice that repaying taxpayers trumped the "fresh start" policy. *See Cohen v. De La Cruz*, 523 U.S. 213, 222, 118 S. Ct. 1212, 140 L.Ed.2d 341 (1998) (citing *Grogan*, 498 U.S. at 287) (exceptions to discharge in § 523(a) reflect a conclusion on the part of Congress that a creditor's interest in payment outweigh the debtor's fresh start).

Section 523(a)(8) of the Bankruptcy Code provides that a student loan debt is not dischargeable unless "excepting such debt from discharge…will impose an undue hardship on the debtor and the debtor's dependents."  11 U.S.C. 523(a)(8). Although the Bankruptcy Code does not define the term "undue hardship," Congress has consistently limited the ability of debtors to discharge their student loan debt through bankruptcy, beginning in 1976.  In 1976, Congress added a provision to the Higher Education Act of 1965, 20 U.S.C. 1001 *et seq.*, that barred the discharge of certain educational loans unless either (a) they had been in repayment for over five years (exclusive of any suspension in repayment), or (b) payment would impose an undue hardship on the debtor or his dependents.  Education Amendments of 1976, Pub. L. No. 94-482, § 127(a), 90 Stat. 2141.  Since then, Congress has intentionally and progressively made it more difficult for student loan obligations to be discharged in bankruptcy.  *See Hemar Ins. Corp. of Am. v. Cox (In re Cox)*, 338 F.3d 1238, 1243 (11th Cir. 2003)("Considering the evolution of § 523(a)(8), it is clear that Congress intended to make it difficult for debtors to obtain a discharge of their student loan

16

indebtedness.").

In 1990, Congress extended the five-year requirement to seven years. Federal Debt Collection Procedures Act of 1990, Pub. L. No. 101-647, § 3621(2), 104 Stat. 4965; 11 U.S.C. 523(a)(8) (1994). Subsequently, in 1998, the seven-year provision was eliminated, allowing discharge of loans only in circumstances of a showing of undue hardship. Higher Education Amendments of 1998, Pub. L. No. 105-244, § 971, 112 Stat. 1837, for bankruptcies filed after October 7, 1998. Most recently, in 2005, Congress expanded the types of student loans that are subject to 523(a)(8) and are therefore not dischargeable absent an undue hardship. Bankruptcy Abuse and Consumer Protection Act of 2005, Pub. L. 109-8, § 220, 119 Stat. 59.

Against this backdrop, it is clear that Congress made the policy choice that federally-insured student aid was only to be discharged in exceptional circumstances.

## B. The Undue Hardship Standard.

Given the evolution of the student loan discharge provision of the Bankruptcy Code as detailed *supra*, it is clear Congress has consistently disfavored discharging federally-guaranteed student loans through bankruptcy. Under the Bankruptcy Code, student loans cannot be discharged in bankruptcy unless the debtor establishes that having to repay the loans would "impose an undue hardship on the debtor and the debtor's dependents." 11 U.S.C. § 523(a)(8). Because Congress selected the word

17

'undue,' the required hardship under § 523 must be more than the usual hardship that accompanies bankruptcy. Inability to pay one's debts by itself cannot be sufficient; otherwise all bankruptcy litigants would have an undue hardship. *Educ. Credit Mgmt. Corp. v. Frushour (In re Frushour)*, 433 F.3d 393, 399 (4th Cir. 2005); *see also In re Alderete*, 289 B.R. 410, 417-418 (Bankr. D. N.M. 2002)("Undue hardship means more than having a tight budget or a present inability to pay, because most debtors could make such assertions")(internal citations omitted).

However, Congress did not explicitly define undue hardship in section 523(a)(8). Thus, courts have examined the legislative purpose surrounding the nondischargeability of student loans in order to devise a method for analyzing complaints brought under this section. The *Brunner* district court expressed the high standard required before a student loan can be discharged

> Through § 523(a)(8), [the government] commits the student to repayment regardless of his subsequent economic circumstances. In return for giving aid to individuals who represent poor credit risks, it strips these individuals of the refuge of bankruptcy in all but extreme circumstances. This is a bargain each borrower strikes with the government. Like all bargains, it entails risks. It is for each student individually to decide whether the risks of future hardship outweigh the benefit of a deferred-payment education.

*Brunner v. N.Y. State Higher Educ. Servs. Corp.*, 46 B.R. 752, 756 (S.D.N.Y. 1985), aff'd., 831 F.2d 395 (2d Cir. 1987). In 1987, the Second Circuit adopted the *Brunner* district court's standard for "undue hardship." *Brunner v. N.Y. State Higher Educ.*

18

*Servs. Corp. (In re Brunner),* 831 F.2d 395 (2d Cir. 1987) (per curiam). Under the

*Brunner* test, a debtor claiming "undue hardship" must demonstrate:

> (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for himself and his dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

*Ibid*, at 396. Over the next twenty years, seven other circuits followed suit, adopting

*Brunner* as the preferred rubric.[2] Along the way, a breadth of case law emerged and

recognition of "the very heavy burden that must be met in proving undue hardship

in the context of seeking a discharge of student loan debt." *In re Duval*, No. 10-

10450 JMP, 2012 WL 1123041, at *5 (Bankr. S.D.N.Y. Apr. 3, 2012).

A debtor seeking to discharge his federal student loan(s) is required to satisfy

all three elements of the *Brunner* test. *Traversa v. Educ. Credit Mgmt. Corp. (In re

Traversa)*, 444 F. App'x 472, 474 (2d Cir. 2011); s*ee also In re Gleason*, No. 15-

31254, 2017 WL 4508844, at *3 (Bankr. N.D.N.Y. Oct. 6, 2017). "If a debtor fails

to establish any one of the three prongs, the court need not continue with its inquiry."

---

[2] *See Pa. Higher Educ. Assistance Agency v. Faish (In re Faish)*, 72 F.3d 298, 305 (3d Cir. 1995); *Educ. Credit Mgmt. Corp. v. Frushour (In re Frushour)*, 433 F.3d 393, 400 (4th Cir. 2005); *Gerhardt v. United States Dept. of Educ. (In re Gerhardt)*, 348 F.3d 89 (5th Cir. 2003); *Oyler v. Educ. Credit Mgmt. Corp. (In re Oyler)*, 397 F.3d 382 (6th Cir. 2005); *United Student Aid Funds v. Pena (In re Pena)*, 155 F.3d 1108, 1112 (9th Cir. 1998); *Educ. Credit Mgmt. Corp. v. Polleys (In re Polleys)*, 356 F.3d 1302, 1309 (10th Cir. 2004); *Hemar Ins. Co. of Am. v. Cox (In re Cox)*, 338 F.3d 1238, 1241 (11th Cir. 2003).

*Gleason*, 2017 WL 4508844, at *3 (citing *Brunner*, 831 F.2d at 396). Here, the Bankruptcy Court concluded that Appellant failed to meet his heavy burden under even one of the *Brunner* prongs.

C.   **Appellant did not and cannot meet his burden under any one of the** ***Brunner*** **prongs, let alone all three.**

Appellant vociferously argues that the Bankruptcy Court erred under the first *Brunner* prong. He claims the Bankruptcy Court committed legal error in concluding he failed to meet his burden because of its erroneous conclusion that his Obligatory Religious Contributions and Donations are excessive and therefore unnecessary to a minimal standard of living. Appellant also claims that the Bankruptcy Court's conclusions in this regard violated his First Amendment Free Exercise rights. He is wrong. Even if, however, the Bankruptcy Court erred in its analysis pertaining to religious tithing and its application to the first *Brunner* prong, Appellant still loses the overall conclusion and his appeal. He has not and cannot meet his burden under the remaining two *Brunner* prongs. When, as here, a case may be resolved on other grounds, courts may decline to reach a constitutional question to "avoid deciding constitutional issues needlessly." *Christopher v. Harbury*, 536 U.S. 403, 417, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002).

Seemingly ignoring his heavy burden under *Brunner* prongs two and three, Appellant proposes that the Bankruptcy Court's alleged erroneous holding under prong one negatively impacted its analysis of *Brunner* prongs two and three. Instead

of identifying any independent reversible error under prongs two and three, Appellant hides behind his religious arguments, using it as his catch-all argument sufficient to satisfy each of the demanding *Brunner* requirements. But this attempt at a religious silver bullet is not enough to prevail under all three *Brunner* prongs and is nothing more than a red herring.

### 1. The Bankruptcy Court did not err in concluding that Appellant failed to satisfy his second *Brunner* prong burden.

The second prong of the *Brunner* test requires a debtor to demonstrate that additional circumstances exist indicating that his state of affairs is likely to persist for a significant portion of the repayment period for the student loan. *Brunner*, 831 F.2d at 396; *see also Pa. Higher Educ. Assistance Agency v. Faish (In re Faish)*, 72 F.3d 298, 305 (3d Cir. 1995). "This is a demanding requirement." *Brightful v. Pa. Higher Educ. Assistance Agency (In re Brightful)*, 267 F.3d 324, 328 (3d Cir. 2001). It is not enough for a debtor to demonstrate that he has experienced current financial hardships, but rather, he must show "a total incapacity ... in the future to pay her debts for reasons not within [his] control." *Id* (*quoting In re Brunner*, 46 B.R. 752, 758 (Bankr. S.D.N.Y. 1985)).

"In addressing this factor, a debtor must demonstrate that the additional circumstances point to a 'certainty of hopelessness' and not merely a present inability to pay student loan debt." *Jean-Baptiste v. Educ. Credit Mgmt. Corp., et al. (In re Jean-Baptiste)*, 2018 WL 1267944, *10 (Bankr. E.D.N.Y February 23,

21

2018).  The "additional circumstances requirement" recognizes that virtually every debtor in bankruptcy is strapped financially and that there must be something more than mere economic distress to justify a finding of undue hardship. *See, e.g., Educ. Credit Mgmt. Corp. v. Davis (In re Davis),* 373 B.R. 241, 250 (W.D.N.Y. 2007)("The type of additional circumstances contemplated by *Brunner* are well beyond those hardships that normally accompany any bankruptcy.").

Appellant complains that the Bankruptcy Court erred in its conclusion on prong two when it failed to consider the impact its "ruling [under prong one related to his Obligatory Religious Contributions and Donations] would affect Mrs. Lozada's ability to practice her religion … ." (App. Br., p. 68). This argument is flawed in a couple of respects. First, Appellant's wife did not testify at trial. The Bankruptcy Court, thus, did not have any testimony from Mrs. Lozada about her religious convictions or her desire to contribute over the 10% that Appellant testified is required by his religion. In other words, there simply was no evidence before the Bankruptcy Court as to Mrs. Lozada's "ability to practice her religion."

Second, and as discussed in more detail *infra*, the Bankruptcy Court did not conclude that all tithing and charitable donations are unnecessary to a minimal standard of living. Rather, the Bankruptcy Court only questioned the reasonableness of the amounts of Appellant's Obligatory Religious Contribution and Extra Donations "in the context of his overall financial condition." (A.A. at 338).

Appellant carries the burden under the *Brunner* test, and he failed to present evidence of any alleged impact the Bankruptcy Court's ruling will have on his wife's freedom to tithe.

Appellant also argues that the Bankruptcy Court failed to consider the financial impact on his household were he to become employed and unable to continue caring for his wife. This argument is a nonstarter for many reasons. Most notably, the Bankruptcy Court found that Appellant's financial situation at the time of trial was such that he *could* repay the ECMC Loan while maintaining a minimal standard of living in spite of his decision to be voluntarily retired. Appellant had the burden to prove that his wife was dependent upon him for care. Yet, he produced no evidence at trial, other than his own testimony, that his wife is an "invalid" or that she solely relies on him for physical and/or financial care. Further, Appellant did not introduce any admissible evidence that it is medically necessary for him to care for his wife and if so, the likely duration of such care. Appellant's wife did not testify about her activities of daily living. And Appellant did not call his wife's doctors to testify about her medical condition(s) and prognosis. Finally, evidence from trial showed that Appellant's wife contributes $4,685 a month to the household's income, while Appellant contributes $1,219. The Bankruptcy Court did not find Appellant's arguments in this regard persuasive because he failed to introduce admissible evidence to support such allegations.

Trial evidence does show, however, that Appellant has substantial experience in the non-profit field and, at the time of trial, opportunities existed for Appellant to obtain employment in that field – with annual salaries that range from $40,000 at the low end to $90,000 at the high end. Appellant does not have any dependents or physical impairments that would prevent him from pursuing and maintaining employment. The simple fact that Appellant is in his sixties and voluntarily retired is not enough to satisfy *Brunner's* second prong. *Spence v. Educ. Credit Mgmt. Corp. (In re Spence)*, 541 F.3d 538, 544 (4th Cir. 2008)(finding that well-educated and qualified but underemployed 61-year-old debtor who had taken on loans late in life could not establish undue hardship); *Fabrizio v. United States Dep't of Educ. (In re Fabrizio)*, 369 B.R. 238, 249 (Bankr. W.D. Pa. 2007) (denying discharge and observing that "the simple fact that the debtor will have to pay his educational loans later into life is merely a consequence of his decision to incur debt for educational purposes during his thirties."); *Chapelle v. Educ. Credit Mgmt. Corp. (In re Chapelle)*, 328 B.R. 565, 572 (Bankr. C.D. Cal. 2005) ("age does not constitute an 'additional circumstance,' especially when [the debtor] is healthy and does not suffer from any age-related illnesses that affect her ability to work"); *Educ. Credit Mgmt. Corp. v. DeGroot (In re DeGroot)*, 339 B.R. 201, 212 (D. Or. 2006); *Educ. Credit Mgmt. Corp. v. Waterhouse*, 333 B.R. 103, 112 (W.D.N.C. 2005)(finding that "[r]ather than presenting evidence of "additional circumstances," the debtor relied

24

on his 51-year-old age to try to satisfy *Brunner's* second prong . . . the advanced age argument does not satisfy the second prong of *Brunner*."); *Educ. Credit Mgmt Corp. v. Blake (In re Blake)*, 377 B.R. 502, 508 (E.D. Texas 2007)(concluding that the debtor did not have any age-related medical condition that would constitute an additional circumstance).

The record before the Bankruptcy Court was replete with evidence in support of the Bankruptcy Court's conclusion that "a 68-year-old who is highly educated, computer literate, and who routinely drives is [ ]capable of working [ ] in a sedentary capacity. Mr. Lozada acknowledged that he likely could work part-time [at] McDonalds. And yet, Mr. Lozada confirmed that he is not currently seeking employment." The Bankruptcy Court properly concluded that Appellant does not currently face any additional circumstances, such as illness, recent disability, or an exceptionally large number of dependents that would hamper his ability to repay his federal student loan. *In re Thoms*, 257 B.R. 144, 149 (Bankr. S.D.N.Y. 2001)(providing examples of the kind of "additional circumstance" contemplated by undue hardship, such as where debtor has experienced illness, developed disability, or become responsible for large number of dependents).  Rather, he simply considers himself retired and chooses to stay that way.

### 2.  The Bankruptcy Court did not err in concluding that Appellant failed to show good faith efforts to repay his ECMC Loan.

As he tried under *Brunner's* second prong, Appellant likewise cannot use his religious donations to usurp his good faith responsibilities pursuant to *Brunner's* third prong. The third, and final, element of the *Brunner* test requires debtors to make good faith efforts to repay the loans.  This is measured by a debtor's ability to obtain employment, maximize income, and minimize expenses, as well as efforts to pay off student loan(s).  *Pobiner v. Educ. Credit Mgmt. Corp. (In re Pobiner)*, 309 B.R. 405, 420-21 (Bankr. E.D.N.Y. 2004). The good faith test recognizes that with the receipt of a government-guaranteed education, the student assumes an obligation to make a good faith effort to repay those loans. *Id*.

Appellant was unable to convince the Bankruptcy Court that using his financial resources for discretionary expenditures in lieu of repaying ECMC was a sufficient showing of good faith under the final *Brunner* prong. This Court should likewise decline to accept Appellant's request to ignore all of his past Extra Donations, donations that went well beyond his Obligatory Religious Contributions and that could have been, whole or in part, allocated to the ECMC Loan. Appellant asks this Court to focus only on his past payments to his federal student loan debt, even payments toward loans that predate his federal consolidation loan that ECMC

now holds.[3] Although Appellant made payments toward his federal student loan, this does not end the good faith inquiry. And even accounting for the payments made, the Bankruptcy Court correctly held that that fact is overshadowed by his failure to maximize income, including seeking more lucrative employment in other fields, allocate certain streams of income to the student loan debt, and pursue restructure of the debt.

Appellant testified that he is voluntarily unemployed despite his substantial experience in the non-profit arena and ability to earn a substantial annual salary. He testified that he has not searched for employment since 2015 and even when he did, his search was limited to the non-profit industry. The evidence from trial highlights Appellant's decision to ignore the ECMC Loan even when he was gainfully employed. Instead, he elected multiple periods of deferments and forbearances from requiring repayment thereby allowing his student loan balance to increase.

Based on his testimony, the Bankruptcy Court concluded that Appellant's failure to maximize his income by seeking employment, even on a part-time basis,

---

[3] Appellant testified about and the Bankruptcy Court considered payments Appellant made toward his federal student loan obligation in the early 90's. However, the student loan obligation held by ECMC and that the Bankruptcy Court found nondischargeable was not created until 2002. Any payments prior to the ECMC Loan coming into existence are irrelevant. *Tetzlaff v. Educ. Credit Mgmt. Corp.*, 794 F.3d 756, 761 (7th Cir. 2015)(concluding that the Bankruptcy Court did not err in refusing to consider payments made to other student loans that were not subject of discharge proceeding); *Spence v. Educ. Credit Mgmt. Corp.*, 541 F.3d 538, 544 (4th Cir. 2008); *In re Cunningham*, No. 04-2636, 2006 WL 1133923, at *4 (N.D. W.Va. Apr. 26, 2006).

precludes a finding that he made a good-faith effort to repay his federal student loan. Many courts have ruled similarly. *In re Pobiner*, 309 B.R. at 420-21 (holding that the plaintiff failed to satisfy the good-faith element of the *Brunner* test, based on, *inter alia*, his admission that, "he has not made any effort to find work for an employer other than … his own contracting business, because of his desire to be his own boss."); *see also Alderete v. Educ. Credit Mgmt. Corp. (In re Alderete)*, 412 F.3d 1200 (10th Cir. 2005) (reversing lower courts and denying undue hardship discharge to debtors working in low-paying jobs that did not utilize their degrees); *Oyler v. Educ. Credit Mgmt. Corp. (In re Oyler)*, 397 F.3d 382, 386 (6th Cir. 2005) (finding, "[c]hoosing a low-paying job cannot merit undue hardship relief."); *United States Dep't of Educ. v. Gerhardt (In re Gerhardt)*, 348 F.3d 89, 93 (5th Cir. 2003)(finding, nothing in the Bankruptcy Code allows a student loan borrower the choice to work in a lower paying field and discharge his student loans at the expense of the taxpayers); *In re Frushour*, 433 F.3d at 401 (concluding, "[h]aving a low-paying job, however, does not in itself provide undue hardship, especially where the debtor is satisfied with the job, has not actively sought higher-paying employment, and has earned a larger income in previous jobs.").

In addition, the Bankruptcy Court found particularly troubling the fact that Appellant neither allocated some or all of his tax returns or the $30,000 inheritance to his federal student loan obligation. And while his student loan debt remained

outstanding, Appellant chose to dine out, provide allowances to his children and grandchildren and chose to rent two apartments for one year, one in New York and one in Florida. When Appellant had the opportunity to make substantial payments toward his ECMC Loan, he frequently chose not to.

Despite his arguments to the contrary, the Bankruptcy Court had ample factual basis – even putting aside his excessive tithing – to conclude that Appellant failed to meet his burden under *Brunner's* good faith prong. Appellant's own evidence at trial precluded a finding of undue hardship. The evidence before the Bankruptcy Court was that Appellant can work, but chooses not to and that even in the face of opportunity to pay down his federal student loan obligation, he chooses to allocate discretionary funds elsewhere in order to maintain a lifestyle that is more than minimal. Thus, even if Appellant is right, and his religious and tithing practice of up to 36% of his annual household income is protected, he still loses on prongs two and three, and this Court need not go any further to affirm the Bankruptcy Court's nondischargeability ruling.

### D.   History of Religious and Charitable Donations in Bankruptcy Cases.

Prior to the passage of the Religious Donation Protection Act, Congress addressed government infringement on the free exercise of religion by enacting the Religious Freedom Restoration Act of 1993 ("RFRA"). The RFRA prohibits the government from substantially burdening a person's exercise of religion and subjects

any such burden to a high standard of scrutiny. With the enactment of the RFRA, debtors, along with religious and charitable institutions, found some protection against judicial attacks on religious or charitable donations. However, bankruptcy courts grappled with the application of RFRA as it applies to avoidance actions and in some cases, even questioned its validity.

In response to the mixed results from bankruptcy courts in applying the RFRA, Congress passed the Religious Donation Protection Act. The act provides three significant amendments to the Bankruptcy Code:

> Congress amended Section 707(b) to make clear that the bankruptcy court should not consider a debtor's modest charitable contributions in determining to whether to dismiss a Chapter 7 case for "substantial abuse." 11 U.S.C. §§ 707(b). Congress also amended Sections 544(b), 548(a) to insulate such charitable gifts from avoidance by a trustee as fraudulent conveyances.   11 U.S.C. §§ 544(b)(2), 548(a)(2), 548(d)(2)(4). Congress also declared that charitable contributions should not be considered "disposable income" by the bankruptcy court in determining the amount of required payments by a debtor to creditors under a Chapter 13 plan.   11 U.S.C. § 1325(b)(2)(A).[4]

*Ritchie v. Northwest Educ. Loan Assn. (In re Ritchie)*, 254 B.R. 913, 920 (Bankr. D. Ida. 2000).

---

[4] The Religious Donation Protection Act also amended or added to the Bankruptcy Code §§ 546(e), 546(f), 546(g), and 548(d). These amendments have no bearing on the matter now before this Court.

Of most significance to this case, Appellant suggests, is that the amendment to section 707(b) now prohibits bankruptcy courts from considering '"whether a debtor has made or continues to make charitable contributions" in determining his ability to pay his unsecured creditors. (App. Br., p. 27 quoting 11 U.S.C. § 707(b)(1)). Appellant's suggested interpretation of 707(b)(1) is far-reaching. Section 707(b) grants bankruptcy courts the authority to dismiss a case if it finds that granting relief would be an "abuse" of the Bankruptcy Code. 11 U.S.C. § 707(b)(1). The Religious Donation Protection Act amended this provision to prohibit the bankruptcy court from considering "whether a debtor has made, or continues to make, charitable contributions" when determining whether to *dismiss* a chapter 7 bankruptcy case for abuse. *Id.*  In contradiction of this clear Congressional intent to keep section 523(a)(8) intact, Appellant nevertheless persists with his theory that the amendments to section 707(b) are to be construed as also amending section 523(a)(8) and imposing the same protections.

Importantly, at the same time Congress amended certain provisions of the Bankruptcy Code to incorporate the Religious Donation Protection Act in 1998, it explicitly limited the scope of section 523(a)(8) student loan dischargeability, i.e. eliminating the seven-year provision. Congress did not, however, further amend section 523(a)(8) to protect tithing or the act of charitable giving more broadly as a necessary expense. Indeed, "[t]he lack of amendment to section 523(a)(8) declaring

31

charitable contributions to be an appropriate expense while at the same time Congress deleted the seven year provision and amended other provisions of the [Bankruptcy] Code to accommodate charitable giving is compelling evidence that Congress did not intend further changes to the section 523(a)(8) analysis." *In re Ritchie*, 254 B.R. at 921.

Also of great significance is that Congress again amended section 523(a)(8) in 2005, long after the Religious Donation Protection Act had been codified into law. As in 1998, Congress did not amend section 523(a)(8) to protect charitable contributions in the undue hardship analysis, which as Appellant points out, was a time that "[c]ourts [ ] struggled with religious payments in bankruptcy." (App. Br., p. 1). Had Congress intended a specific scheme related to religious tithing (or charitable giving more generally) or had Congress been similarly dismayed with bankruptcy courts' treatment of the same in its undue hardship analyses, it had opportunity to address such issue on at least a few occasions. The fact that section 523(a)(8) was not also amended to protect unbridled religious donations cannot be ward off as some simple Congressional oversight.

**E.**     **The Religious Donation Protection Act does not apply to student dischargeability proceedings.**

Appellant's real grievance is the Bankruptcy Court's findings as to the exorbitance of his religious tithing and donations. He argues that the Bankruptcy Court committed reversible error in holding that the Religious Donation Protection

Act did not protect his ability to include his unbridled religious donations in his budget. (App. Br., p. 23). As pointed out *supra*, this Court need not decide this issue because Appellant cannot meet his demanding burden of proof under *Brunner* prongs two and three and therefore, is not entitled to an undue hardship discharge. But should the Court reach this issue, the Bankruptcy Court findings of fact and conclusions of law in this regard should be affirmed.

Notwithstanding Appellant's confusion about what the Bankruptcy Court actually concluded, the Religious Donation Protection Act did not amend, and therefore does not apply to, dischargeability proceedings under section 523(a)(8). The interpretation of the Bankruptcy Code begins with the language of the statute itself, *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989), and in this case, the language of the statutes in question could not be more clear about the Congressional intent.

"Statutory interpretation always begins with the plain language of the statute, assuming the statute is unambiguous." *Universal Church v. Geltzer*, 463 F.3d 218, 223 (2nd Cir. 2006) citing *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002). "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion." *Bates v. United States*, 522 U.S. 23, 29030, 118 S.Ct. 285,

139 L.Ed.2d 215 (1997). Legislative intent may also be gleaned from reviewing the

legislative history for a particular statute. *Id*. at 223-224.

The legislative history makes clear that the Religious Donation Protection Act

is the creation that was in response to a "spate of lawsuits by bankruptcy trustees

trying to undo tithes or charitable donations." 144 CONG.REC. S4769-01 (May 13,

1998) (statement of Sen. Grassley). The majority of the debate and testimony

surrounding the specifics of the Religious Donation Protection Act relate to the

fraudulent transfer provisions of the Bankruptcy Code. For example, in his opening

remarks, Senator Grassley who sponsored the Senate version of the bill (which

ultimately became law) said:

> Of course, [lawsuits against churches] puts the fiscal
> health of many churches at serious risk. Most churches and
> charities don't have big bank accounts. Having to pay back
> money that has been received and already spent is a real
> hardship for churches which often live on a shoe-string
> budget. S.1244 will protect against that.

*Id*. In addition, Representative Gekas's comments complement those of Sen.

Grassley in that the purpose of the bill is to "correct" the practice of a trustee's ability

to recover charitable donations from a church under the fraudulent transfer provision

of the Bankruptcy Code. 144 CONG.REC. H3999-02 (June 3, 1998) (statement of

Rep. Gekas). Importantly, upon review of the Congressional Record pertinent to the

passage of the Religious Donation Protection Act, any reference to amending section

523(a)(8) was not found.

34

In this case, the Bankruptcy Court's conclusion that the Religious Donation Protection Act did not create a *per se* exemption from contractual obligations is consistent with the plain meaning of the statute as well the case law interpreting this statute. *See In re McLeroy*, 250 B.R. 872, 880 (Bankr. N.D. Tex. 2000); *In re Ritchie*, 254 B.R. at 921; *In re McCormack*, Case No. 99-80401, 2000 WL 33710278, *fn. 7 (Bankr. D.S.C. 2000). As the Bankruptcy Court did here, bankruptcy courts have similarly declined to extend the protections of the Religious Donation Protection Act to its section 523(a)(8) analysis in almost identical circumstances as Appellants. Although bankruptcy courts' analyses may differ, the conclusions are steadfast that the protections provided by the Religious Donation Protection Act do not make their way into a section 523(a)(8) analysis.

For example, the bankruptcy court in *McLeroy* rejected the idea that religious tithing is automatically protected as a matter of right by the Religious Donation Protection Act in a section 523(a)(8) analysis. *See In re McLeroy*, 250 B.R. at 879. The *McLeroy* court reasoned that the main purpose behind the amendments was to provide churches some protection from actions for fraudulent transfer where the debtor's tithe or donation stemmed from a sincere, longstanding religious conviction. Thus, the *McLeroy* court concluded, the Religious Donation Protection Act should not be considered in relation and has no applicability to section 523(a)(8). *Id*.; *see also In re Ritchie*, 254 B.R. at 921; *In re McLaney*, 375 B.R. 666, 681 (M.D.

Ala. 2007)("[T]his court agrees that tithing is not a per se allowable expense because the [Religious Donation Protection Act] made no changes to § 523(a)(8) and nothing in § 523(a)(8) provides for it.").

Other bankruptcy courts decline to apply the Religious Donation Protection Act to section 523(a)(8), reasoning that the sections amended are simply too different from § 523(a)(8) to be considered "consistent" with each other. *See Fulbright v. United States Dep't of Educ. (In re Fulbright)*, 319 B.R. 650, 661 (Bankr. D. Mont. 2005). Following an in-depth analysis of the Religious Donation Protection Act, the *Fulbright* court concluded that "[a]lthough the problems are similar (ascertaining whether there are sufficient resources to fund payments), the objects (disposable income for plan confirmation vs. payment without undue hardship) differ." *Id*. at 658. For these reasons, the court concluded that religious and significant charitable donations are not as a matter of law, acceptable expenses in determining whether discharging student loan debt would result in undue hardship under § 523(a)(8). *See also In re McCafferty*, 2015 WL 6445185 at *6 ("this court echoes the other courts that have noted that the [Religious Donation Protection Act] made no changes to § 523(a)(8).").

A minority of bankruptcy courts, including a case cited by Appellant in support of his position, conclude that the Religious Donation Protection Act protects a debtor's tithing and charitable donations in section 523(a)(8) actions. *See i.e. In re*

*Lebovits*, 223 B.R. 265 (Bankr. E.D.N.Y. 1998). In the case cited by Appellant, however, the bankruptcy court's analysis was as scant as merely mentioning the passage of the Religious Donation Protection Act with no real analysis of the act. *Id*. Decided only two months after the enactment of the Religious Donation Protection Act and without any real legal analysis, the court concluded that Lebovits satisfied his burden under the first *Brunner* prong because the "amendment provides, among other things, that an individual consumer debtor may donate up to fifteen (15%) percent of his income to his church or synagogue … and this sum could not be included in tallying the Debtor's income." *Id*. at 273.

Even if the isolated position of the *Lebovits* court was correct and a debtor's religious tithing of up to 15% is generally protected by the Religious Donation Protection Act in an undue hardship analysis, Appellant's Obligatory Religious Contributions and Donations in at least some years was over double the amount that is purportedly protected.

Regardless, bankruptcy courts that thoroughly analyze the Religious Donation Protection Act are not divided on its applicability to undue hardship dischargeability matters as Appellant suggests. Bankruptcy courts, albeit for different reasons, consistently conclude that Congress intended no change to section 523(a)(8) when it passed the Religious Donation Protection Act. *In re McLeroy*, 250 B.R. at fn. 11 ("The Court finds it notable that Congress amended 11 U.S.C. § 523(a)(8) [ ] in 1998

with the passage of Public Law 105-244; it became effective within four months of the time the amendments by the [Religious Donation Protection Act] went into effect. However, the two acts make no mention of one another in either their language or legislative history."). At least one bankruptcy court found it noteworthy that Congress included federal student loan creditors as a special creditor described in section 523(a)(8). *In re Ritchie*, 254 B.R. at 921. The *Ritchie* court opined that "it cannot be assumed that Congress intended that the special class of creditors described in section 523(a)(8) should suffer discharge as a result of the [religious] practice." *Id.*

Where bankruptcy courts differ, is in their interpretation of Congress's omission of a change to section 523(a)(8) when it enacted the Religious Donation Protection Act. While some courts rely on the rule of statutory interpretation to conclude that the omission is a *per se* exclusion of charitable giving as an allowable expense, other courts conclude that the Religious Donation Protection Act had no impact on section 523(a)(8) and continue to consider charitable giving expenses on a case-by-case basis. *Compare In re Ritchie*, 254 B.R. at 919 ("[T]he Court construes Section 523(a)(8) to exclude such donations from determining Plaintiffs' available income under the undue hardship analysis" even in light of the passage of the Religious Donation Protection Act) *with In re McLaney*, 375 B.R. at 681-82 ("[T]he [Religious Donation Protection Act] did not amend § 523(a)(8) in any form or

fashion" however "bona fide tithing or charitable contributions are to be examined under the same reasonableness standard as other reasonable and necessary expenses under a § 523(a)(8) undue hardship analysis.").

Here, the Bankruptcy Court agreed that "any interpretation that expressly allows or disallows tithing should be rejected as both interpretations seem to amend [section] 523(a)(8)" and proceeded to evaluate whether, on this record, Appellant's Obligatory Religious Contributions and Extra Donations constituted a reasonably necessary expenditure in the context of his overall financial condition. (A.A. at 337); *see In re McLaney*, 375 B.R. at 682 ("bona fide tithing or charitable contributions are to be examined under the same reasonableness standard as other reasonable and necessary expenses under a § 523(a)(8) undue hardship analysis."). A court making this determination:

> must apply its common sense knowledge gained from ordinary observations in daily life and general experience to determine whether [a debtor's] expenses are reasonable and necessary. If [the debtor] expends funds for items not necessary for the maintenance of a minimal standard of living or if [the debtor] expends too much for an item that is needed to maintain that minimal standard, then it is unlikely that, given [the debtor's] present circumstance, the first prong of the *Brunner* test is satisfied where such overpayment would permit [the debtor] to cover the expense of her student loan debt without sacrificing a minimal standard of living … .

*In re Douglas*, 366 B.R. 241, 253-54 (Bankr. M.D. Ga. 2007). In short, the first *Brunner* prong is an evaluation of the debtor's household income and the expenses

necessary to meet a debtor's basic needs, such as food, shelter, clothing, transportation and medical treatment, "with a view toward ascertaining whether the debtor has attempted to minimize the expenses of himself and his dependents." *U.S. Dept. of Health & Human Serv's v. Smitley*, 347 F.3d 109, 117 (4th Cir. 2003); *Pincus v. Graduate Loan Ctr. (In re Pincus)*, 280 B.R. 303, 318 (Bankr. S.D.N.Y. 2002).

By Appellant's own admission, he and his wife's Obligatory Religious Contribution is 10% because they are "Christians and we believe that's what the Bible says. And so it will be that, that's what we do. We also give offerings sometimes that *go beyond* the ten percent." (A.A. at 137)(emphasis added). When pressed further about how he and his wife determine how much to donate, Appellant explained

> A.   Okay. So, you know, we start off with ten percent which is what call a tie (sic); ten percent of any income that's coming in from any source.
>
> Q.   Okay.
>
> A.    And then to that we add, you know, there might be a physical need in the church or a request for something or we just feel in our hearts to be part of something and so, you know, there's no – we're not using a formula as much as responding to, you know, what we perceive to be a need or we feel in our hearts. You know, I don't want to over

spiritualize things here or come off as too religious, but I'm just telling

you what, you know, in honesty what we pray about things and we feel

that to do something, you know, in that area, we do it, we do it by faith.

\* \* \* \*

A.      Again, the ten percent would increase and decrease according to what

the increments. Right. That's the basis. *The additional giving, I don't*

*think it really mattered.*

(A.A. at 168-69)(emphasis added).

Appellant testified that his Christian beliefs only require him and his wife to

tithe 10% of their income.[5] It was Appellant's burden of proof to explain the

justification for his Extra Donations above the 10%. The Bankruptcy Court's

conclusion that Appellant's overall religious tithing and donations were excessive

over the last several years prior to his bankruptcy filing was taking into account

Appellant's own definition for his Obligatory Religious Contribution. It was

Appellant's burden to defend the reasonableness of his Extra Donations over the

Biblically-prescribed 10% he described at trial.  A burden, the Bankruptcy Court

concluded, Appellant fell short of meeting.

---

[5] For purposes of this appeal, ECMC declines to explore whether this is even a reasonable and necessary expense under the first *Brunner* prong.

To be clear, the Bankruptcy Court did not apply a *per se* exclusion of religious tithing as a reasonable expense under the first *Brunner* prong, but instead concluded that Appellant's Extra Donations of 10-26% more than his Obligatory Religious Contribution was excessive and unexplained under his particular circumstances. The Bankruptcy Court found Appellant's Extra Donations to be excessive in the same manner it found several of Appellant's other expenses to be excessive. Other expenses that the Bankruptcy Court found to be excessive was the roughly $500 a month food budget due to frequent dining out with his wife and adult children; the weekly allowances to his granddaughter and gifts of money to his adult children, none of whom are Appellant's dependents. The Bankruptcy Court also found troubling Appellant's multiple trips to Puerto Rico and a family vacation to Virginia Beach in the years leading up to his chapter 7 bankruptcy petition. It was likewise an unnecessary expense, the Bankruptcy Court found, that Appellant leased a Florida rental in 2016 while maintaining a home in New York the same year, all while failing to make payments on his student loan debt. Similarly, Appellant's move from the Bronx in New York to Stanford in Connecticut tripled his rent obligations. Acknowledging Appellant's reasons for moving, the Bankruptcy Court sensibly concluded that "to suggest that there were no suitable homes available at a lower rent strains credulity." *See In re Douglas*, 366 B.R. at 253-54 (bankruptcy courts must "must apply its common sense knowledge gained from ordinary observations

in daily life and general experience to determine whether [a debtor's] expenses are reasonable and necessary.").

The Bankruptcy Court had many examples of Appellant's failure to minimize discretionary expense aside from his excessive Extra Donations. It was not just one of these excessive expenditures alone that prevented Appellant from meeting his burden under the first *Brunner* prong, but the conglomerate of several excessive and unnecessary expenses. By Appellant's own admission, his religious imperative is satisfied with a 10% tithe. The Bankruptcy Court weighed his testimony on this issue and found that Appellant's Obligatory Religious Contribution combined with his Extra Donations were excessive and unnecessary for a minimal standard of living.

As Appellant's other gross expenditures highlight, his excessive and unnecessary discretionary spending in reality is not about his religious convictions (that is satisfied, as Appellant testified, with a ten percent tithe) but about a lifestyle that Appellant is unwilling to disrupt in order to repay his taxpayer-funded student loan. The evidence at trial was clear that Appellant is able to tailor his expenditures when he wishes to do so, all while still maintaining his standard of living.

The Bankruptcy Court did not err in concluding that the Religious Donation Protection Act has no direct bearing upon its section 523(a)(8) analysis. As such, the Bankruptcy Court was well within its authority to analyze Appellant's Extra Donations and Obligatory Religious Contribution under the same reasonableness

standard as other secular reasonable and necessary expenses. Under these circumstances, the Bankruptcy Court found, Appellant's Extra Donations were excessive. The excessive tithing and charitable donations along with his other excessive discretionary spending, the Bankruptcy Court concluded, precluded him from meeting his burden under the first *Brunner* prong. This was not error, and the Bankruptcy Court's findings of fact and conclusions of law in this regard should be affirmed.

### F.   The Bankruptcy Court employed the proper income and expense analysis under the first *Brunner* prong.

Appellant attempts to convince this Court that "[c]alculating a budget under § 707(b) is a prerequisite to assessing undue hardship under § 523(a)(8)." (App. Br., p. 39). He cites no case law for this novel argument. Moreover, Appellant's argument, if taken as true, would essentially collapse the tripartite *Brunner* test into a two-part test and is an improper back-door attempt to impose certain restrictions in § 707(b) on the undue hardship analysis under § 523(a)(8). This argument has already been addressed by bankruptcy courts in a Chapter 13 context and subsequently rejected.

The first *Brunner* prong requires bankruptcy courts to evaluate the debtor's household income and the expenses necessary to meet a debtor's basic needs, such as food, shelter, clothing, transportation and medical treatment. *In re Pincus*, 280 B.R. at 318. Although there is overlap between § 707(b) and case law's interpretation

44

of undue hardship, the § 523(a)(8) analysis does not begin and end with a debtor's

alleged Schedule I and J budget.

> In undue hardship analysis, most courts employ the same model as is used to determine "disposable income" for Chapter 13 plan confirmation purposes. Although the problems are similar (ascertaining whether there are sufficient resource to fund payments), the objects (disposable income for plan confirmation vs. payment without undue hardship) differ. Under § 1325, a debtor is generally not required to alter reasonable lifestyle choices. The same can be said of § 707(b) analysis, which generally focuses on the availability of sufficient disposable income to fund a Chapter 13 plan.

> Under § 523(a)(8), the debtor's lifestyle (particularly expenses) is subjected to more rigid scrutiny. Courts differ on the degree of scrutiny applied, or, more precisely, on how much hardship a debtor can be expected to bear before it becomes "undue." But deference to a debtor's lifestyle choices is, to put it kindly, muted. Eliminating some expenses that would be considered legitimate under § 1325 [or § 707(b)] might well be done without creating "undue" hardship.

*Educ. Credit Mgmt. Corp. v. Savage (In re Savage)*, 311 B.R. 835 (B.A.P. 1st Cir.

2004).[6]

---

[6] Also worthy of note, the Congressional Record is significant for comments by legislators concerned with fraud and abuse by implementing the protections of the Religious Donation Protection Act. "As [Sen. Grassley] mentioned in the opening statement, there is a limitation in the law of 15 percent of your annual income that can be given in this fashion. So we don't anticipate any type of abuse." 144 CONG.REC. S4769-01 (May 13, 1998) (statement of Sen. Durbin). "Only genuine charitable contributions and tithes are protected by [the Religious Donation Protection Act]. Accordingly, a transfer of assets which looks like a tithe or a charitable donation, but is actually fraud, can still be set aside." 144 CONG.REC. S4769-01 (May 13, 1998) (statement of Sen. Grassley).

The lack of consistency and differing purposes between the statutes make it improper for a bankruptcy court to perfunctorily import the protections of the Religious Donation Protection Act, those in section 707(b) specifically, to the § 523(a)(8) hardship analysis. Unlike a 707(b) analysis, bankruptcy courts have wide discretion in analyzing a debtor's expenses and determining their reasonableness. This is because Congress purposely carved-out student loans from a general discharge in bankruptcy, while progressively making it more difficult to discharge student loans.

It is difficult to discern the analogy Appellant attempts to draw between the instant case and one the Supreme Court of the United States decided in 2014. In the Supreme Court case of *Law v. Siegel*, the bankruptcy court used its equitable powers to deny a debtor his homestead exemption which contravened a specific provision of the Bankruptcy Code. *Law v. Siegel*, 571 U.S. 415, 134 S.Ct. 1188, 188 L.Ed.2d 146 (2014). Applying normal rules of statutory construction, the Supreme Court reversed and remanded because the bankruptcy court violated the express terms of a statute. *Id*. at 422-423. It appears Appellant is trying to analogize the case of *Law v. Siegel* to his position, arguing that the more specific mandates of section 707(b)

---

Thus, while the 15 percent limitation is in the context of determining allowable expense in a Chapter 13 bankruptcy, this limitation does infer that Congress was trying to strike a balance between a debtor's genuine religious convictions and fairness to creditors.

should also be applicable to section 523(a)(8) and essentially override the undue hardship analysis.

However, were the Court to agree with Appellant's theory, the outcome would be exactly what the Supreme Court struck down in *Law v. Siegel*. Appellant's theory would force bankruptcy courts to substitute a 707(b) analysis in place of a section 523(a)(8) undue hardship analysis, ostensibly requiring the bankruptcy courts violate the express terms of the Bankruptcy Code and ignore Congressional intent. *See Dennison v. Hammond (In re Hammond)*, 236 B.R. 751, 767-68 (Bankr. D. Utah 1998)("Had Congress intended to allow charitable contributions to be factored into income reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor it would have so stated … . The negative pregnant rule of statutory construction requires that an express statutory statement, such as the amendments to § 1325(b)(2)(A), contrasted with the statutory silence regarding including [sic] charitable contributions in § 523(a)(15)(A), shows an intent to confine the allowance of charitable contributions to § 1325(b)(2)(A).").

The Bankruptcy Court's first *Brunner* prong analysis evaluating Appellant's household income and the expenses necessary to meet his basic needs was consistent with Second Circuit legal authority. Thus, this Court should affirm its findings of fact and conclusions of law in this regard.

### G.    The Religious Freedom Restoration Act also does not apply.

Contrary to Appellant's argument, the RFRA is equally inapplicable to a section 523(a)(8) analysis. At the outset, it is even questionable whether the RFRA is still good law – a source of confusion for some courts. *See i.e. Christians v. Crystal Evangelical Free Church*, 141 F.3d 854, 863 (8th Cir. 1997)(concluding that Congress did not violate the Establishment Clause in enacting RFRA). Nevertheless, in *City of Boerne v. Flores*, 521 U.S. 507, 535, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), the Supreme Court of the United States held the RFRA unconstitutional. Further evidence that the RFRA is no longer considered good law was the passage of the Religious Donation Protection Act clarifying the protections that are to be afforded to religious and charitable donations in certain bankruptcy proceedings. And as explained above, this did not include section 523(a)(8) dischargeability proceedings.

Moreover, the RFRA does not apply in suits where the government is not a party. *See Listecki v. Official Comm. of Unsecured Creditors*, 780 F.3d 731, 736 (7th Cir. 2015)("Based on RFRA's plan language, its legislative history, and the compelling reasons offered by our sister circuits," the Seventh Circuit concluded that RFRA is not applicable in cases where the government is not a party.); *see also Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 410-11 (6th Cir.2010); *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 834, 837-43

(9th Cir. 1999).

The plain language of the statute is that "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability … ." 42 U.S.C. § 2000bb-1(a). Appellant does not allege that ECMC is the "government", a prerequisite to triggering the statute. The Bankruptcy Court had no reason to conduct a RFRA analysis.[7]

Finally, Appellant, laboring to find error in the Bankruptcy Court's decision, claims that the Bankruptcy Court cited to a United States Supreme Court case that was apparently abrogated by RFRA according to Appellant. *Emp't Div. Dep't of Human Res. of Ore. v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). A thorough review of the Bankruptcy Court's opinion in this case suggests Appellant is mistaken. The Bankruptcy Court did not on even one occasion cite the Supreme Court's decision in *Smith*. To the contrary, the Bankruptcy Court analyzed Appellant's income and expenses under the minimal standard of living standard as prescribed by the *Brunner* test. In doing so, the Bankruptcy Court "review[ed] the reasonableness of the [Appellant's] budget – particularly the allocation of projected

---

[7] Simply for the sake of clarity and contrary to Appellant's assertions that because the FFELP program was discontinued in 2010, the government no longer has a legitimate public interest in recovering outstanding federal student loan obligations created pursuant to FFELP, the funds recovered from FFELP borrowers, like Appellant, are instrumental to ensuring the credibility and stability of the ongoing William D. Ford Direct Loan Program ("Ford Program"). The Ford Program is designed similarly to how the FFELP was: assure that future generations of students will have a viable loan program available to them.

expenses in relation to projected income as it determines his capabilities to pay the instant obligations without undue hardship." (A.A. at 335)(quoting *In re Pincus*, 280 B.R.at 317).

### H.   Section 523(a)(8) as applied by the Bankruptcy Court did not offend the First Amendment.

Section 523(a)(8) is a neutral law, which is not designed to promote or restrict religious beliefs. *In re Lynn*, 168 B.R. 693, 700 (Bankr. D. Ariz. 1994); *In re Belcher*, 287 B.R. 839, 848 (Bankr. N.D. Georgia 2001). Neutrality and general applicability are relevant in considering a law's impact with respect to religion.[8] *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). The Free Exercise Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof … ." U.S. Const., amend. I. The right to exercise one's religion freely, however, "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Smith*, 494 U.S. at 879. Indeed, an individual's religious beliefs do not excuse him from compliance with an otherwise valid, neutral law prohibiting something that the state is free to regulate. *Smith*, 494 U.S. at 878-79, 110 S.Ct. 1595.

---

[8] The strict scrutiny test is not applicable to bankruptcy law. *United States v. Kras*, 409 U.S. 434, 446, 93 S.Ct. 631, 638, 34 L.Ed.2d 626 (1973).

The tests for "[n]eutrality and general applicability are interrelated, and …failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Lukumi*, 508 U.S. at 531, 113 S.Ct. 2217. Nonetheless, a court must consider each criterion separately so as to evaluate the text of the challenged law as well as the "effect … in its real operation." *Id*. Accordingly, a court assessing whether a challenged law violates the First Amendment must determine whether the challenged law is neutral *and* generally applicable.

Appellant is not disputing that section 523(a)(8) is facially constitutional. (App. Br., p. 55 ("Section 523(a)(8) can be applied constitutionally to student loan debtors who engage in religious expenditures."). Appellant appears to take issue with the general applicability consideration of a free exercise analysis, arguing the Bankruptcy Court's order denying him a discharge of the ECMC Loan violates the free exercise clause of the First Amendment by forcing him to choose between freely exercising his religious beliefs or repaying the ECMC Loan. The Bankruptcy Court diligently pointed out that Appellant did not raise the constitutionality of section 523(a)(8) as applied to the facts in this case. *Marschand v. Norfolk and Westerner Railway Co.*, 81 F.3d 714, 716 (7th Cir. 1996)("factfinder need not consider any claim or theory not raised in the pretrial order"); *Morro v. City of Birmingham*, 117 F.3d 508 (11th Cir. 1997). Consequently, the Bankruptcy Court declined to decide that issue and confirmed that its analysis is "confined to how tithing factors into a

determination of whether a plaintiff can maintain a minimal standard of living if required to repay his student loans under section 523(a)(8). (A.A. at 337-38). Appellant is in a similar conundrum on appeal. Because he failed to plead the issue initially, and then failed to raise the issue below, this Court is divested of its jurisdiction to hear him to complain now. S*ee Lavoie v. Pacific Press & Shear Co., a Div. of Canron Corp.*, 975 F.2d 48, 56 (2nd Cir. 1992)(explaining that objections raising constitutional protections may be waived or forfeited).

In any event, Appellant failed to convince the lower court that his Extra Donations over and above his Obligatory Religious Contributions had a religious basis. Appellant's testimony was that he and his wife are "Christians and we believe [ ] what the Bible says" is to tithe ten percent but that the "additional giving, *I don't think it really mattered*." (A.A. at 168-69)(emphasis added). By his own admission, Appellant's religion only requires him to tithe ten percent of their household income. He did not testify that a component of his church membership was an expectation that he donate greater than the ten percent or that he would lose certain benefits were he to donate less. *See In re Lynn*, 168 B.R. at 700 ("Debtor receives services or benefits from her church, irrespective of whether she tithes.").

Appellant did not present any evidence that his religious beliefs required him to tithe anything greater than ten percent. The ECMC Loan did not prohibit or impair his Obligatory Religious Contribution. Similarly, his continued obligation to ECMC,

due to the Bankruptcy Court's order denying discharge, is ultimately neutral: it neither requires him nor prohibits him from his Obligatory Religious Contribution. *See In re Belcher*, 287 B.R. at 849. Thus, the Bankruptcy Court's conclusion that Appellant's tithing (over the ten percent) is excessive under the circumstances is not forcing him to choose between his religious convictions and repaying the ECMC Loan. For this reason alone, Appellant failed to establish that section 523(a)(8) as applied by the Bankruptcy Court violated his free exercise rights pursuant to the First Amendment. Simply put, Appellant's desire to donate in excess of his Obligatory Religious Contribution does "not excuse him from compliance with an otherwise valid law". *Smith*, 494 U.S. at 878-79, 110 S.Ct. 1595; *see also* Romans 13:7-8 ("Pay to all what is owed to them: taxes to whom taxes are owed, revenue to whom revenue is owed, respects to whom respect is owed, honor to whom honor is owed. Owe no one anything … .").

### I.   Appellant is not entitled to a partial discharge.

Appellant failed to satisfy his burden under the Brunner test which also makes him ineligible for a partial discharge. Section 105(a) of the Bankruptcy Code establishes the equitable powers to the bankruptcy court. This provision states: "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). But because § 105(a) only grants the power to "carry out the provisions" of the Bankruptcy Code, bankruptcy

courts cannot grant a partial discharge to a debtor who does not *first* prove undue hardship. *See In re Davis*, 373 B.R. 241; *In re Alderete*, 412 F.3d at 1207 (emphasis added). "To allow the bankruptcy court, through principles of equity, to grant any more or less than what the clear language of § 523(a)(8) mandates would be tantamount to judicial legislation and is something that should be left to Congress, not the courts." *In re Cox*, 338 F.3d at 1243 (quotations omitted).

Here, Appellant did not satisfy any of the three *Brunner* prongs thus the Bankruptcy Court did not have the authority to grant a partial discharge. The salient point in this case is that Appellant *can* repay the ECMC Loan. He is currently living a more than minimal lifestyle as he enjoys a sizeable surplus after accounting for his basic needs. And with a little belt-tightening, Appellant would be in an even better position to repay the ECMC Loan. He just chooses not to.

## VI.   CONCLUSION

Appellant confuses the Bankruptcy Court's findings. He seems to submit that the Bankruptcy Court disallowed any tithing as a reasonably necessary expense in its undue hardship analysis. This is not what the Bankruptcy Court concluded. Instead, it concluded that Appellant has all the freedom to tithe, but his freedom to do so does not alleviate his contractual requirement to repay his student loan obligation. Regardless, this Court need not reach this issue because Appellant, an educated healthy individual with no dependents, cannot meet his arduous undue

hardship burden under all three individually-determinative *Brunner* prongs. For all the reasons argued *supra*, this Court should affirm the Bankruptcy Court's conclusion that Appellant is not entitled to an undue hardship discharge of his taxpayer-funded student loan.

Dated: Hackensack, New Jersey
        March 11, 2019

                                        LAW OFFICES OF KENNETH L. BAUM LLC
                                        Attorneys for Appellee Educational Credit Management Corporation

                       By:    */s/ Kenneth L. Baum*
                            Kenneth L. Baum
                            167 Main Street
                            Hackensack, NJ 07601
                            (201) 853-3030
                            (201) 584-0297 Facsimile

## **STATEMENT OF ORAL ARGUMENT**

ECMC submits that oral argument would not be beneficial because "the facts and legal arguments are adequately presented in the briefs and record" and this Court is not likely to be significantly aided by oral argument.  *See* Fed. R. Bankr. P. 8019(b)(3).


Dated: Hackensack, New Jersey
　　　March 11, 2019

LAW OFFICES OF KENNETH L. BAUM
LLC
Attorneys for Appellee Educational Credit
Management Corporation

By:    */s/ Kenneth L. Baum*　　　　　　
　　　Kenneth L. Baum
　　　167 Main Street
　　　Hackensack, NJ 07601
　　　(201) 853-3030
　　　(201) 584-0297 Facsimile

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Rule 8015(a)(7)(B) or

8016(d)(2) because this brief contains 12,724 words, excluding the parts of the brief

exempted by Rule 8015(a)(7)(B)(iii) or 8016(d)(2)(D).


Dated: Hackensack, New Jersey
      March 11, 2019

                                  LAW OFFICES OF KENNETH L. BAUM LLC
                                  Attorneys for Appellee Educational Credit Management Corporation

               By:    */s/ Kenneth L. Baum*             
                      Kenneth L. Baum
                      167 Main Street
                      Hackensack, NJ 07601
                      (201) 853-3030
                      (201) 584-0297 Facsimile